THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. GREGORY AGNEW, Defendant-Appellant.

Second District   No. 2—88—0795

Opinion filed December 28, 1989.

Susan Valentine, of Law Offices of Jed H. Stone, Ltd., of Chicago, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan, and Richard L. Salon, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

A jury found defendant, Gregory Agnew, guilty of armed robbery, and the court sentenced him to a term of 30 years' imprisonment. Defendant raises two issues on appeal: first, whether the trial court erred in denying his motion for a mistrial when the bailiff who attended to the jury was the sole witness to an alleged confession of the defendant; and second, whether the trial court abused its discretion

when it failed to recognize defendant's rehabilitative potential when sentencing him to 30 years' imprisonment. We affirm.

The trial of defendant commenced on the morning of June 13, 1988. After hearing motions *in limine*, the court had the deputy direct the prospective jurors into their seats in the courtroom, and the court conducted the *voir dire*. Before all the jurors were selected, the court recessed at noon and reconvened at 1:30 p.m. to complete the panel of jurors. After a brief recess, the trial commenced.

The State's first witness was Sandra Hill. She testified that in the early morning hours of February 24, 1988, she, her boyfriend, Tommy Miller, and Derrick Lovelace met at Haakeem Adu's house, where they drank beer and wine. Defendant and Tommy Miller began to argue and then went outside to fight. After the fight, Miller noticed he was missing $200 and his heroin, and Hill, defendant, Miller and Bay Walls searched for the items. After Walls left, defendant, Hill, Miller and Lovelace got in Lovelace's car and drove to various locations in Waukegan to search for Walls, who they suspected took the missing items, but did not find him. At one stop, Miller picked up a pronged garden hoe and dropped it in the backseat where defendant was sitting. At approximately 3:30 a.m., they stopped at a gas station to buy snacks. Hill testified that defendant stated that he saw a Mexican man coming out of the station handling what he thought was hundreds of dollars in cash. Defendant asked the party if anyone wanted "to be in on it." She stated that the other passengers stated that they did not want any trouble, and when defendant exited the car, they drove away. Hill heard a man holler, and she looked out the rear window and saw defendant hit the man with the hoe.

Carlos Duarte was the man whom defendant hit with the hoe. Duarte testified that he was on his way to work at 3:30 a.m. on February 24, 1989. He stopped at the gas station, paid for $5 worth of gasoline with a $50 bill and received $45 in change, which he put in his shirt pocket. He went outside to pump the gas and was then hit from behind. Having received a blow to his head with the hoe, he fell to the ground. A man he identified as defendant grabbed him by the collar, demanded money, searched his coat pocket, pants pockets and wallet, which were empty, and took a dollar bill from his left pants pockets. Duarte was taken to the hospital where he received eight stitches on his scalp and two shots for tetanus.

The State's next witness was Officer Herbert Browne of the North Chicago police department. He testified that at 4:30 a.m. he met defendant, who complained that Derrick Lovelace threatened defendant with a garden hoe, stole his jacket, and drove away. Browne fur-

ther testified that defendant made an incidental inquiry, which Browne did not include in his official report, of whether a robbery had occurred in the vicinity of the gas station.

At this point in the trial, approximately 3:45 p.m., the court recessed for the day and the jury was sent home. The assistant State's Attorney then informed the court that he had just received a message that the bailiff who had been attending the jury, Deputy Fred House, had a material conversation with defendant at the time defendant was arrested and that Deputy House might be called as a rebuttal witness. Defendant moved for a mistrial, alleging that a relationship had been established between the bailiff and the jury which would attribute enhanced credibility to the bailiff by the jury. Defense counsel declined to question the bailiff about any conversations he might have had with the jurors because she did not see the problem to be any particular conversation, but rather the special relationship engendered by the bailiff's caring for the jury. The court denied the motion for mistrial because it failed to find prejudice when the bailiff's contact with the jury had been limited and there had only been two hours of testimony that day. However, a new bailiff was assigned to the courtroom for the rest of the trial.

The following day, the State rested. Defendant took the stand and testified that he was with Lovelace, Miller and Hill in the car. He had asked for a ride home, but the others went driving to various locations in Waukegan to look for drugs. They then decided to put gas in the car. Derrick went into the station to pay and asked defendant to pump the gas and to discard the hoe. Defendant attempted a basketball-style jump shot with the hoe, but missed the trash barrel, and the hoe landed on the concrete island between the pumps. At that time, Duarte walked up and tried to use the pump. They argued over who was to use the pump, exchanged racial epitaphs and then began to fight. After Duarte kicked defendant in the groin, defendant picked up the hoe and fought back but took no money. Meanwhile, Lovelace pulled the car away with defendant's coat in it. Defendant ran after it, but the car did not stop. Defendant then called the police to report the theft of his coat. Defendant did not mention the fight because the fighting was cause for expulsion from the alcohol rehabilitation program which he had voluntarily joined.

After the defense rested, the State called Deputy Fred House, the bailiff during the first day of the trial, as a rebuttal witness. He testified that on February 24, 1988, at 2:45 p.m., he met defendant in the receiving station of the Lake County jail during the changing of the shift. House asked defendant, "What the fuck are you doing here?"

Defendant responded, "It's over a dollar. Fucked up. This is over one dollar. Somebody should beat my ass and let me go home." Deputy House testified that he did not write a report of the conversation and did not realize it would become important until he sat through the first day of the trial, at which time he informed his supervisor of his situation.

During closing arguments, the State summarized the evidence and challenged the defendant's version of the incident. The prosecutor recalled Deputy House's testimony, stating that defendant told House, " 'I robbed him. It was over a buck. It was over a fucking dollar. You ought to whip my fucking ass and send me home for a dollar.' " The prosecutor also argued, "And you know he did it because he admitted it to Fred House."

The jury found defendant guilty, and defendant appeals. Defendant first contends the court should have declared a mistrial when the bailiff who attended to the jury was the sole witness to an alleged confession and was not revealed to the defense until the middle of the trial. Defendant contends that he was denied the right of a fair trial before an impartial jury because the jury put great confidence in Deputy House's testimony by virtue of his relationship to the court and by his association with the jurors. Defendant relies primarily on the case of *Turner v. Louisiana* (1965), 379 U.S. 466, 13 L. Ed. 2d 424, 85 S. Ct. 546. In *Turner*, the jury found the defendant guilty of the charge of murder, and he was sentenced to death. The principal witnesses for the prosecution were two deputy sheriffs who had been involved in the investigation of the crime and the arrest of the defendant. They testified to an oral admission and a written confession of the defendant, who did not himself take the stand. The jury was sequestered during the trial and placed in the charge of the two deputies as bailiffs. The witnesses later testified to the particulars of their contacts with the jury which showed, the Supreme Court found, that the witnesses had "freely mingled and conversed with the jurors in and out of the courthouse during the trial." (379 U.S. at 468, 13 L. Ed. 2d at 426, 85 S. Ct. at 547.) The court held that despite the lack of any evidence that either deputy had ever spoken to a juror about the case, the conviction of the defendant violated the fourteenth amendment, stating:

> "[E]ven if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution. ***
>
> It would have undermined the basic guarantees of trial by jury

to permit this kind of an association between the jurors and two key prosecution witnesses who were not deputy sheriffs. But the role that Simmons and Rispone [the deputy sheriffs] played as deputies made the association even more prejudicial. For the relationship was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial." (Emphasis omitted.) 379 U.S. at 473-74, 13 L. Ed. 2d at 429-30, 85 S. Ct. at 550.

The courts of Illinois have reviewed several cases involving instances where a bailiff or sheriff may have influenced a jury, but none of the cases approached the facts of *Turner* in the seriousness of the influence. In *People v. Jackson* (1968), 94 Ill. App. 2d 207, 236 N.E.2d 102, deputy sheriff Colwell, a witness for the prosecution, gave a member of the jury a five-minute ride home, but did not discuss the case. The trial court, after examining both the juror and the deputy, determined that there was no prejudice. The appellate court was not persuaded that the casual relationship, however ill-advised, constituted prejudice of the defendant's right to a fair trial as a matter of law, as opposed to the *Turner* case, where prejudice was established as a matter of law by reason of the continuous and close association between the prosecution witnesses and the jury. 94 Ill. App. 2d at 212, 236 N.E.2d at 104.

In *People v. Rettig* (1972), 50 Ill. 2d 317, 278 N.E.2d 781, a sheriff had a two- or three-minute conversation with the jurors about their noon meal. The sheriff's testimony during the trial had been neither crucial nor controverted. The Illinois Supreme Court declined to rule that the contact should be presumed to be prejudicial as a matter of law. The court ruled that the jury's verdict would not be set aside where it was apparent that no prejudice had resulted from the impermissible and imprudent contact with the sheriff. 50 Ill. 2d at 319, 278 N.E.2d at 782.

In *People v. Gaines* (1981), 88 Ill. 2d 342, 430 N.E.2d 1046, at the sentencing hearing, the prosecution called as witnesses two deputy sheriffs who had been assigned to the courtroom in which the trial had been held. They testified concerning the defendant's misconduct as they transported the defendant between the lockup and the courtroom. They also had the duty of keeping order in the courtroom. However, there was no showing that there existed a "close and continuing association" between the deputies and the jury and no basis to infer the existence of a relationship which would " 'foster the jurors' confidence' in the witnesses." 88 Ill. 2d at 371, 430 N.E.2d at 1061.

In *People v. Ong* (1981), 94 Ill. App. 3d 780, 419 N.E.2d 97, the

defendant asserted that the presence of the sheriff at the prosecution table had an intimidating effect upon the jurors because he served as a "silent witness" even though he never took the stand. The court told the jurors that the sheriff's staff could assist them if they needed assistance in getting home. While the appellate court found the presence of the sheriff improper, absent a showing of actual prejudice, the error was not of sufficient magnitude to require reversal. 94 Ill. App. 3d at 787, 419 N.E.2d at 103.

■ In the cause before the court, defendant urges that the influence of Deputy House's presence was prejudicial as a matter of law because it approaches the conduct condemned in *Turner*. The influence of Deputy House exceeded the influence of those deputies in *Gaines*, *Rettig*, *Jackson* or *Ong*. Deputy House actually tended to the jury on the first day of the trial and turned out to be the key rebuttal witness the next day. The matter is further worsened because the existence of Deputy House's testimony was not disclosed to the defense, as it was not known by the prosecution until the end of the first day's testimony. Furthermore, Deputy House's testimony was significant, directly relevant to the defendant's version of the facts, and relied upon by the prosecution during closing arguments.

The record in this case does not precisely reflect the amount of time Deputy House spent tending to the jury. The testimony on the first day of trial lasted for two hours in the afternoon. The record does not indicate what his duties were in the morning before and after the jury was impaneled. There is no indication that he provided them lunch, provided personal services or had conversations with any of the jurors. The trial judge was closer to the events of that day and a direct observer of the activities in the courtroom. He stated:

> "THE COURT: Naturally, the court was not aware of this at the beginning, nor was the State—.
>
> MR. FULTON [Assistant State's Attorney]: That's correct.
>
> THE COURT:—but I can't see that any error has been deliberate by the State to prejudice the jury. The contact so far has been quite limited. I suppose we could question the jurors about it, but I think that at this time the contact has been so limited because we just selected the jury and commenced the evidence, so I'll deny the motion for mistrial."

Because nothing in the record contradicts the trial court's conclusions, its decision that there was no prejudice to defendant under these circumstances was not clearly erroneous. We cannot conclude that the bailiff's behavior created prejudice as a matter of law either. Although the bailiff had some contact with the jury, it was nowhere near the

"continuous and intimate association" created by the deputies in the *Turner* case. In *Turner*, the deputies renewed old friendships, made new acquaintances, and actively participated both as witnesses and as court officials, whereas in the cause before the court, the bailiff's court assignment was accidental, and the court made every effort to reduce the prejudice once the bailiff's situation became known. Therefore, we affirm the trial court's order denying the motion for a mistrial, and the jury's verdict stands.

After the jury found defendant guilty, the court conducted a sentencing hearing. David Yarc, a detective of the Waukegan police department, testified that on May 12, 1988, after defendant had been indicted for armed robbery and before trial, defendant had attempted to steal several packages of meat from a grocery store. He also testified that defendant had been identified as a man fleeing from a grocery store with several items on May 8, 1988. Defendant did not present any evidence.

The State, in its argument before the sentencing judge, made mention of defendant's previous terms of imprisonment, including a sentence of three years' imprisonment ordered on December 6, 1978, for the acts of possession of a controlled substance and two counts of aggravated battery. Defendant had also pleaded guilty to two counts of forgery and was sentenced to three years' imprisonment on August 1, 1986, when his probation for the offense of attempted residential burglary was revoked. The State also mentioned that defendant had other convictions for which he was sentenced to imprisonment and that he had committed the instant offense of armed robbery while on parole and while on leave from the Gateway House program for alcohol rehabilitation. The State argued that defendant posed a risk to society, that Mr. Duarte was injured from the blow to his head, and that defendant was a dangerous person. The State asked for a sentence of 25 years' imprisonment, which was short of the maximum sentence for a Class X felony of 30 years (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3)).

Defendant argued that the hearsay testimony of Detective Yarc was unreliable and that the lineup identifications about which he testified were flawed. Defendant argued that while he had a serious drug problem, he had demonstrated a desire to cure the problem by enrolling in treatment centers and had successfully completed the programs in the past. While he was on parole, he was able to stay employed and voluntarily enrolled at the Gateway House, without having to be ordered to enroll. Defendant argued that this desire indicated he was not the sort of person who wanted to commit crimes but who wanted to deal with his drug problem. Defendant also reminded the court that

defendant had a mother who was ill and that he had three children.

The defendant addressed the court with his right of allocution. He stated that he had remorse for fighting Carlos Duarte. He also mentioned that he had always pleaded guilty when he knew he was guilty but chose not to for this offense because he had faith in the criminal justice system. He was also afraid for his mother and his children and said that the State had not adequately searched the gas station to find the dollar bill Duarte said he lost.

The court stated that it would disregard the alleged violations of May 1988, but expressed doubt that defendant would ever overcome his drug problems. The court remarked that it had to take into consideration the interests of society and concluded that defendant was a person who in all likelihood would commit more offenses if he were let back on the street. The court stated that because society had to be protected, it was sentencing defendant to 30 years' imprisonment.

Defendant then brought a motion to reconsider the sentence. At the hearing, the court read from the presentence investigation report. Besides the offenses previously mentioned by the State, defendant had committed numerous traffic offenses, battery in 1977, theft in 1979, attempted residential burglary in 1984, forgery in 1986, and finally, the Class X felony of armed robbery herein involved. The defendant had progressed from less serious offenses to more serious offenses. The court denied the motion, and defendant appeals, arguing that the court failed to recognize defendant's rehabilitative potential as demonstrated by defendant's recognition of his substance-abuse problem and voluntary attempts to receive treatment.

■ A sentence will not be disturbed on review unless there is a showing of abuse of discretion by the sentencing court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 883.) Although the trial court is charged with the difficult task of fashioning a sentence which would strike the appropriate balance between the protection of society and the rehabilitation of the offender, it is not the function of the reviewing court to serve as a sentencing court, and the reviewing court cannot substitute its judgment for that of the trial court merely because it would have balanced the appropriate factors differently. *People v. Cox* (1980), 82 Ill. 2d 268, 280, 412 N.E.2d 541, 547.

■ Defendant urges that the sentencing court must not "resign to total retribution one who has a chance of future restoration to useful citizenship in a free society." (*People v. Gibbs* (1977), 49 Ill. App. 3d 644, 648, 364 N.E.2d 491, 494.) However, the opinion in *Gibbs* does not prevent a judge in an appropriate case from determining that the reha-

bilitative potential of a defendant is so slight that the penalty imposed may be based solely on principles of retributive justice. (*People v. Shumate* (1981), 94 Ill. App. 3d 478, 485, 419 N.E.2d 36, 42.) We find that the trial court did address defendant's rehabilitative potential directly and determined that it was slight and that defendant would in all likelihood commit other offenses in the future. The trial court had a superior opportunity to acquire information about defendant, and we do not find an abuse of discretion in its determination. *People v. Dunnegan* (1987), 151 Ill. App. 3d 973, 985, 503 N.E.2d 823, 831.

The cases cited by defendant do not support his argument. In *People v. Brown* (1980), 90 Ill. App. 3d 742, 414 N.E.2d 475, the trial court abused its discretion when it failed to appreciate the defendant's rehabilitative potential. In that case, the defendant voluntarily abandoned the criminal act of burglary, withdrew from the act, and prevented further criminal actions by his accomplices. (90 Ill. App. 3d at 751, 414 N.E.2d at 482.) He was also 19 years old, had an alcohol problem and had only a short juvenile record. (90 Ill. App. 3d at 752, 414 N.E.2d at 483.) In *People v. Treadway* (1985), 138 Ill. App. 3d 899, 486 N.E.2d 929, the appellate court also looked beyond the brutality of the crime to examine the defendant's rehabilitation potential. In that case, the defendant was only 24 years old, had only a minor criminal history, and had personally addressed his alcohol problem and had joined Alcoholics Anonymous. 138 Ill. App. 3d at 905, 486 N.E.2d at 933.

In contrast, the defendant before the court had repeated failures at rehabilitation. He also had an extensive record which was not improving. Although he had voluntarily enrolled in the Gateway House program for substance abuse treatment, he had gone to a late night party while on a two-day leave to visit his ailing mother. Defendant was 29 years old and had committed numerous felonies in his last 10 years. Defendant's actions constituted a violent crime. He thought the victim was handling hundreds of dollars, and the seriousness of the offense is not diminished by the fact defendant found only $1. Defendant also used violent means and inflicted serious injury on the victim with the pronged garden hoe. It was thus not an abuse of discretion for the court to find the defendant had only a slight rehabilitation potential. Therefore, we will not disturb the trial court's sentencing decision on review.

For the above reasons, the judgment of the trial court is affirmed.

Affirmed.

McLAREN and WOODWARD, JJ., concur.